# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
April 26, 2016

Plaintiff-Appellee,

v

No. 325192
Ionia Circuit Court
LC No. 2014-015993-FH

KYLE BRANDON RICHARDS,

Defendant-Appellant.

Before: SAAD, P.J., and BORRELLO and GADOLA, JJ.

PER CURIAM.

Following a jury trial, defendant Kyle Brandon Richards was convicted of assault of a prison employee, MCL 750.197c. He was sentenced as a fourth-offense habitual offender, MCL 769.12, to 50 months to 40 years' imprisonment. The sentence is to be served consecutively "to any other sentence currently being served." Defendant appeals as of right, and for the reasons set forth in this opinion, we affirm defendant's conviction but remand for further proceedings.

## I. BACKGROUND

This appeal arises from an incident that occurred while corrections officers transported defendant to the segregation unit at Bellamy Creek Correctional Facility. On January 3, 2013, corrections officers Christopher Balmes and Christopher Hudson escorted defendant to the segregation unit. Balmes, the victim in this case, testified that he had not previously dealt with, saw, or heard of defendant before January 3, 2013. According to the victim, defendant was handcuffed behind his back, and Hudson and the victim were each on one side of defendant holding one of his arms while escorting him. The victim testified that defendant was not yelling but that he seemed upset. Hudson testified that defendant made some statements directly to him during the escort. Hudson further testified that defendant made a comment that the officers would not be able to do anything if he assaulted them. The victim testified that they first took defendant to the shower because, before inmates go to the segregation unit, they are strip searched in the shower to make sure they do not have any contraband. Once they arrived at the shower cell, defendant was placed into the shower cell. The victim testified that the door closed behind defendant and automatically locked.

According to the victim, he turned to walk away after defendant was placed in the shower cell, and defendant "crouched down next to an opening in the wall (known as a 'restraint slot') and spit through it, hitting [the victim] in the arm." Hudson testified that through his peripheral

-1-

vision he also saw defendant bend down, spit through the restraint slot, and hit the victim's arm with saliva. The victim, who was wearing a short-sleeved uniform, testified that the saliva landed on his right forearm and pant leg area and that the saliva "was basically a spit spray." The victim further testified that the saliva was "not a big wad," did not contain phlegm or blood, and hit a section of him rather than just one spot. According to the victim, it was not possible for the substance on his arm to be water or something else from the shower because he saw defendant spit on him and because there were no other inmates in the shower cell besides defendant.

The victim's supervisor, John Nicewicz, was standing in the vicinity when the incident happened. The victim testified that, as a reaction to being spit, he walked over and told his supervisor because the supervisor needed to know about misconduct. Nicewicz testified that he was turned away and did not see defendant spit on the victim but that the victim told him that "he just got spat on." According to Nicewicz, the saliva "was basically clear" and "kind of looked like a spray or a mist." Nicewicz further testified that he believed that the substance was spit because the shower was not on and because it did not look like water. The victim testified that he made a written report of the misconduct and that Nicewicz took pictures of the areas containing saliva. Using a digital camera, Nicewicz took pictures of the victim's arm and pant leg, which were admitted at trial. The victim testified that, after the pictures were taken, he washed his arm off with soap and water. The victim further testified that, after work, he washed his pants. With respect to spitting incidents, Nicewicz testified, "We train the officers and have them leave the saliva on their body and we try to photograph it and then obviously have them wash it off as soon as what we get what we think are good photographs." Nicewicz further testified that he had never collected clothing that had very small amounts of saliva on it—such as the victim's pants in this case—as evidence. Defendant was eventually charged with one count of assault of a prison employee.

During the pretrial phase, defendant filed numerous motions in propria persona and changed attorneys several times. Defendant also raised numerous other motions, including filing a "notice of change of plea and request for D.N.A and polygraph examination" that requested to change his plea, DNA testing of the victim's clothing, and a polygraph examination of all witnesses; a motion to remove and disqualify his current attorney, coupled with a request for reappointment of counsel; and a motion to quash and bar 4th habitual sentence enhancement upon constitutional challenge of habitual application. After a hearing on April 22, 2014, the trial court granted defendant's request for a new attorney.

The trial court heard yet another motion for new counsel on June 3, 2014. At this hearing, defendant's second appointed attorney stated that there was a breakdown in the attorney-client relationship. According to counsel, defendant told counsel not to visit him, and defendant refused to see counsel or listen to any of his advice. Appointed counsel further stated that he could not prepare for trial because of those reasons and that it was a hostile work environment for him because of "threats here of Judicial Tenure Commission [and] the Attorney Grievance Commission." In response, the prosecution noted that trial was scheduled for that week. After some dialogue between defendant and the trial court, the trial court asked defendant, "Do you wish to represent yourself in these proceedings?" Defendant responded, "No, I do not. I want [c]ounsel that is effective . . . I want an attorney who will do their job." Defendant subsequently threatened to seek legal reprimand by going to the Judicial Tenure Commission, the

Attorney Grievance Commission, the Civil Rights Commission, and to the Governor, "if [he] ha[d] to." Thereafter, the trial court granted the motion for new counsel. A third attorney was appointed as defendant's counsel. Not long thereafter, there was another motion for new counsel, and, on August 12, 2014, there was a hearing to address this motion wherein defense counsel withdrew his motion. At the hearing, defense counsel stated, "Your Honor, [defendant] and I had an opportunity to discuss the case and discuss our differing opinions. I respect him. I believe he respects me and now we will withdraw the motion." On October 20, 2014, voir dire began with defendant's third appointed counsel as defendant's attorney.

On the morning of the sole day of trial and right after the prospective jurors swore to truthfully answer the voir dire questions, defense counsel asked the trial court if he could approach. After the potential jurors exited the courtroom, defense counsel stated that defendant indicated that he now wanted to represent himself. Following argument from the prosecution, the trial court then allowed defendant an opportunity to speak, and he stated that he had questions for the jury and that he should be allowed to ask them because he was going to represent himself. In response, the trial court stated:

> [Defendant], I'm going to interrupt you because you are not representing yourself. We have had numerous pretrial motions in this matter and this is now the 3rd attorney who has been appointed to represent you. [Defense counsel] has worked very hard to accommodate your requests and to present those to the Court. The Court finds that your request to represent yourself is *untimely*. Again, you've had multiple opportunities to present this issue to the Court and so your request to represent yourself is denied here today.

> [Defendant], I'm not going to entertain this further at this point in time in light of the fact that [defense counsel] has presented to me a list of questions that you provided to him, that we have reviewed this morning and have found to be fair questions that the Court will be asking the jurors. But as the prosecutor argued, the Court Rules do provide the Court with the discretion and authority to conduct voir dire and this Court will be doing that. Very quickly. I'm not going to be leaving the jurors out in the hallway long. Was there something else you wanted to say? (emphasis added).

Defendant then stated that he wanted to call other prisoners as witnesses to discredit the testimony from the corrections officers. The trial court concluded the matter by stating that they were in the middle of voir dire, that the issue of witnesses could be addressed at a later time, and that defendant's request to represent himself was denied. After the prosecution's case-in-chief, defendant stated, "As stipulated to at the beginning before the jury came here, I did want to represent myself and there were things I would like to address with the Court. There were witnesses I wanted to bring. None of those things were allowed. So the least the Court could do is grant me the right to take the stand." Defendant then proceeded to testify against the advice of counsel. Subsequently, before closing arguments occurred, defendant placed an objection regarding his witnesses on the record. Specifically, he stated, "I want to let the Court know my dissatisfaction of not being allowed to call several prisoners as witnesses who would have been used to discredit the officers and prove they were engaging in perjury. . . ." He further stated that he was not able to call these witnesses because of the trial court's denial of his request to

-3-

represent himself and that the witnesses could testify that the officers routinely falsify statements. The trial court stated that the objections were noted but overruled because, "[a]s [it] underst[ood] the issue, there were no other inmates directly involved in this situation and [defendant] did not have any prior knowledge, particularly of [the victim] prior to this incident." The trial court concluded that attacking the "fabrication of reports" did not have an adequate basis in this case. The jury subsequently found defendant guilty of assaulting a prison employee and defendant was sentenced as noted above. He now appeals as of right.

## II. RIGHT TO SELF-REPRESENTATION

"The Sixth and Fourteenth Amendments of our Constitution guarantee that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment." *Martinez v Court of Appeal of California*, 528 US 152, 154; 120 S Ct 684, 687; 145 L Ed 2d 597 (2000). However, a "defendant also 'has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so.' " *Id*., quoting *Faretta v California*, 422 US 806, 807; 95 S Ct 2525, 2527; 45 L Ed 2d 562 (1975). See also *Faretta*, 422 US at 835-836 (holding that the defendant was denied the constitutional right to conduct his own defense when he clearly and unequivocally requested to do so "weeks before trial"). Further, "[a]lthough the right to proceed in propria persona is guaranteed by the United States Constitution, the Michigan Constitution, and state statute, this right is not absolute." *Ahumada*, 222 Mich App at 616. Generally, before a court may allow a defendant to proceed in propria persona,

> [the] court must determine that (1) the defendant's request is unequivocal, (2) the defendant is asserting his right knowingly, intelligently, and voluntarily through a colloquy advising the defendant of the dangers and disadvantages of self-representation, and (3) the defendant's self-representation will not disrupt, unduly inconvenience, and burden the court and the administration of the court's business. *Russell*, 471 Mich at 190.

Defendant argues, and we agree, that the right to self-representation is an established Federal and State Constitutional right. *Faretta*, 422 US at 807; Mich Const 1963, art. 1, sec. 13; *Ahumada*, 222 Mich App at 616. However, the right to self-representation is not without its limitations. Since *Faretta*, the consensus that has emerged from state and federal appellate courts is that a request for self-representation can only be denied for three reasons: (1) if it is untimely, ordinarily if made after trial has begun; or (2) if there is sufficient certainty of serious obstructionist misconduct, or (3) if no valid waiver can be accomplished. LaFave, Israel and King, 3 Criminal Procedure (2d ed.), § 11.5(d) at 582-584.

In *People v Hill*, 485 Mich 912; 773 NW2d 257 (2009), our Supreme Court held that the trial court's decision "denying [a] request for self-representation 'at this time' did not deny the defendant his constitutional right to self-representation where the defendant's request was *not timely* and granting the request at that moment would have disrupted, unduly inconvenienced, and burdened the administration of the court's business." (Emphasis added). As was the case here, the trial court in *Hill* simply denied the defendant's request and failed to make any

pertinent inquiry whether defendant's request to represent himself was unequivocal or whether he knowingly, intelligently, and voluntarily wished to waive his right. *People v Hill*, 282 Mich App 538, 551; 766 NW2d 17 (2009), vacated in part by *Hill*, 485 Mich at 912. Nonetheless, as previously noted, our Supreme Court found that the defendant's right to self-representation was not violated because the request was untimely. *Hill*, 485 Mich at 912.

Subsequently, the Sixth Circuit Court of Appeals analyzed the issue in further detail and denied Hill habeas corpus relief on the issue. *Hill*, 792 F3d at 674.[1] The Sixth Circuit explained that, on the first day of the defendant's trial, "as potential jurors were 'on their way up to the courtroom,'" defendant informed the trial court that he wanted to represent himself. *Hill*, 792 F3d at 674. The trial court denied the request and stated:

> No. The court is not going to allow that, especially at the last minute. Also, it's not going to be helpful. There is no early indication of this. We are ready to proceed with the trial at this time. To be prepared for that, and to inform the defendant and have him prepared for following the rules of asking questions and rules of evidence, the court is going to have to do that during the trial. So at this point it's not going to work.
>
> You may consult with your attorney. We are going to have you sitting right next to him. If you would like paper and pen to tell him what you would like, how you would like things, you can do that.
>
> We expect and want you to have all the participation you want. We also want you to have a legal representative to follow the rules of the courtroom. So at this time it is denied. *Id*.

With respect to the timeliness of asserting the right, the Sixth Circuit explained:

> However, "[a]s the *Faretta* opinion recognized, the right to self-representation is not absolute." *Martinez v Ct of Appeal of Cal, Fourth App Dist*, 528 U.S. 152, 161 (2000). First, a defendant may forfeit his self-representation right if he does not assert it "in a timely manner." *Id*. at 162. Such a limit reflects that "[e]ven at the trial level . . . the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Id*. In other words, if the right is asserted in an untimely manner, it may be deemed forfeited as a threshold matter. *Id*. at 677.

The Sixth Circuit further explained that "*Faretta* did not establish a bright-line rule for timeliness," that the defendant's request in *Faretta* occurred weeks before trial, and that "the Supreme Court has never defined the precise contours of *Faretta's* timing element." *Id*. at 678-679. However, "'most courts require [a defendant] to [assert his right] in a timely manner,'" *id*.

---

[1] "Decisions of federal courts of appeals, while not binding on this Court, may be persuasive." *People v Bosca*, 310 Mich App 1, 76 n 25; 871 NW2d 307 (2015).

at 679, quoting *Martinez*, 528 US at 161-162; 120 S Ct 684, and "[g]iven the general standard articulated in *Faretta*, 'a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard,'" *Hill*, 792 F3d at 679, quoting *Knowles v Mirzayance*, 556 US 111, 123; 129 S Ct 1411; 173 L Ed 2d 251 (2009). "[T]o the extent that *Faretta* addresses timeliness, as a matter of clearly established law it can only be read to require a court to grant a self-representation request when the request *occurs weeks before trial*." *Hill*, 792 F3d at 678 (emphasis added). In making its conclusion that the Michigan Supreme Court's holding (that the defendant was not denied his constitutional right to self-representation) was not unreasonable, the Sixth Circuit reasoned that "[a] trial judge may fairly infer on the day of trial—as the jurors are on their way to the courtroom—that a defendant's last-minute decision to represent himself would cause delay, whether or not the defendant requests a continuance." *Hill*, 792 F3d at 681.

The Sixth Circuit also addressed defendant's main argument on this appeal, namely that it was reversible error for the trial court not to have engaged in the findings set forth in MCR 6.005(D). In finding that case law imposes no such requirement, the Sixth Circuit opined:

> First, the U.S. Supreme Court has never held that a court must inquire into the basis of a defendant's request before denying it as untimely. In other words, the trial court's denial of Hill's motion was not at odds with clearly established law. Second, the Michigan Supreme Court's holding was not based on a determination that the trial court's inquiry was a *Faretta*-compliant. Rather, the Michigan Supreme Court held that the trial court did not violate Hill's Sixth Amendment right because his "request was not timely and granting the request at that moment would have disrupted, unduly inconvenienced, and burdened the administration of the court's business." *Hill*, 773 N.W.2d at 257. The Michigan Supreme Court's decision was not therefore contrary to or an unreasonable application of *Faretta's* requirement to inquire into whether Hill's request was knowing, intelligent, and voluntary.

We are in accord with the Sixth Circuit's holding. We do not glean from any case law presented or reviewed that a trial court *must* conduct a *Faretta* inquiry prior to denying a request as untimely. *Hill*, 792 F3d at 678; *Faretta*, 422 US at 835 because the underlying rationale for a trial court to conduct an inquiry pursuant to MCR 6.005(D) "is to inform the defendant of the hazards of self-representation, not to determine whether a request is timely." *Id.* The issue of whether defendant intelligently and voluntarily waived his right to self-representation was not at issue in *Hill*. Similarly, it is not an issue in this case. Rather, the dispositive issue in both cases was whether defendant asserted his right to self-representation in a timely manner. Therefore, it was unnecessary for the trial court to engage in an inquiry pursuant to MCR 6.005(D).

The difficulty in deciding whether a request for self-representation is timely lies in the fact that *Faretta* did not establish a bright-line rule for timeliness. Likewise, our Supreme Court has been reluctant to establish a bright-line rule for timeliness going so far as to hold:

> The people would have us announce a guideline which would preclude the assertion of the right to proceed without counsel if it is not made before the trial begins. We cannot accede to this request. Although the potential for delay and

-6-

inconvenience to the court may be greater if the request is made during trial, that will not invariably be the case. *People v Anderson*, 398 Mich 361, 368; 247 NW2d 857 (1976).

Recognizing that *Anderson* precludes us from establishing a bright-line rule does not lead us to opine that we are forbidden from using the date of the request relative to the date of trial as *a factor* when considering the issue of timeliness. Clearly, timeliness is established, at least in part, by the date of trial relative to the date of the request. Indeed, to the extent the Supreme Court considered the issue of timeliness in *Farcetta*, they did so by correlating the date that defendant's request was made to the date of the trial, finding that defendant's request was made "[w]ell before the date of trial," and "weeks before trial." *Farcetta*, 422 US at 807; *Hill*, 792 F3d at 678.

Having decided the date of the request relative to the date of trial is a factor to be considered, we next turn to the entirety of the record to determine whether the request to self-representation was timely.

In this case, defendant brought numerous pre-trial motions. Importantly, defendant never made a request for self-representation. In fact, when specifically asked by the trial court if he wanted to represent himself defendant emphatically replied: "No." Rather than proceed in propria persona he told the trial judge he wanted an "effective" attorney. In direct response to his request, the trial court appointed a different attorney to represent defendant. Following that ruling, defendant continued to file motions with the trial court, (some of which are named above), but at no time did defendant make a request for self-representation. Then, approximately one week from the scheduled date of trial, defendant again requested that the trial court appoint a different attorney to represent him. Again, the trial court honored defendant's request. Shortly thereafter, defendant again resumed filing motions with the trial court. It was not until after the jury had been sworn that defendant, through counsel, made the request to proceed in proper personia. It was at that juncture that the trial court denied the request finding the request untimely.

Viewing the entirety of the record, we find that the defendant was not deprived of his constitutional right to self-representation. The trial court placated defendant's proclivity to request substitute counsel. By the date of trial, defendant had the benefit of three separate trial counsel. On these facts, we cannot find how defendant's constitutional right to counsel was denied. Rather, the record clearly reveals that defendant was afforded every opportunity to the effective assistance of counsel, including the right to represent himself. That he declined to affirmatively assert his right to counsel until the date of trial, coupled with all of the other factors outlined in this opinion, leads us to concur with the trial court's finding that defendant's request was untimely. Further, to the extent it may be necessary under our Supreme Court's decision in *Hill*, we also conclude from the record evidence that "granting the request at that moment would have disrupted, unduly inconvenienced, and burdened the administration of the court's business." *Hill*, 485 Mich 912. Consequently, the trial court's decision denying defendant's request to self-representation was well within the range of reasonable and principled outcomes and was not an abuse of discretion. *Hicks*, 259 Mich App at 521; *Ahumada*, 222 Mich App at 614. Accordingly, defendant is not entitled to relief.

## III. DESTRUCTION OF EVIDENCE

Next, defendant argues that he was denied due process by the destruction of evidence. This Court reviews a defendant's constitutional due process claim de novo. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007). To warrant reversal on a claimed due process violation involving the failure to preserve evidence, "a defendant must prove that the missing evidence *was exculpatory* or that law enforcement personnel acted in bad faith." *People v Hanks*, 276 Mich App 91, 95; 740 NW2d 530 (2007) (emphasis added). More specifically, as relevant here, when the evidence is only "potentially useful" failure to preserve the evidence does not amount to a due process violation unless bad faith can be shown. *Arizona v Youngblood*, 488 US 51, 58; 109 S Ct 333, 337; 102 L Ed 2d 281 (1988). A "[d]efendant bears the burden of showing that the evidence was exculpatory or that the police acted in bad faith." *People v Johnson*, 197 Mich App 362, 365; 494 NW2d 873 (1992).

Before trial began, defendant filed a motion to dismiss the case based on the failure to preserve the victim's shirt, which defendant argued contained samples of the alleged saliva. In response, the prosecution argued that the victim was wearing a short-sleeved shirt and that the saliva landed on his forearm. Defendant then argued that the alleged saliva likely splattered onto the shirt. The trial court denied the motion because defendant's argument was speculative in nature and was based on what conceivably could have happened. At a subsequent motion hearing, defendant argued that the case should be dismissed based on the failure to preserve the saliva. Defendant argued that failing to preserve the saliva violated MDOC policy and that the substance could not be tested because it was not preserved. The trial court denied the motion stating that defendant was free to make the argument to the jury at trial. The trial court reasoned that "it was not reasonable to expect the officer to wait until a forensic team came to collect this sample, if it was even collectible, so to speak, particularly in light of the fact that there is evidence in the form of photographs."

Failing to preserve potentially useful evidence can amount to a due process violation in certain situations. In *Arizona v Youngblood*, 488 US 51, 57-58; 109 S Ct 333, 337; 102 L Ed 2d 281 (1988), the Court stated:

> The Due Process Clause of the Fourteenth Amendment . . . makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said that it could have been subjected to tests, the results of which might have exonerated the defendant.

The Court then held, "We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id* at 58. Thus, to warrant reversal on a claimed due process violation involving the failure to preserve evidence, "a defendant must prove that the missing evidence was exculpatory or that law enforcement personnel acted in bad faith." *People v Hanks*, 276 Mich App 91, 95; 740 NW2d 530 (2007), lv den 480 Mich 1008 (2008). A "[d]efendant bears the burden of showing that the evidence was exculpatory or that the police

acted in bad faith." *People v Johnson*, 197 Mich App 362, 365; 494 NW2d 873 (1992), lv den 442 Mich 931 (1993).

Here, defendant failed to demonstrate that the evidence was exculpatory as opposed to potentially exculpatory if subject to tests that yielded favorable results. Defendant argues that the substance on the victim's arm was exculpatory because, if the substance had been preserved, testing could have ruled out defendant as a source or shown that the substance was water instead of saliva. While defendant testified he did not spit at anyone and that water from the showerhead could have splattered off the floor and through the restraint slot, testimony from the corrections officers and police strongly supported that defendant spat on the victim. The victim testified that the substance on his arm was not water because he saw defendant spit on him. Hudson testified that the shower cell was a confined space; defendant was the only inmate in the shower cell; and that he saw defendant spit on the victim. Hudson testified that the shower was off. Further, according to Nicewicz, the victim reacted and said that "he just got spat on." In addition, there was testimony that the saliva was "spray spit" and was not a large "wad," and, as the trial court alluded to, the sample may not have been able to be collected. Thus, for these reasons, defendant has shown only that the evidence was potentially exculpatory. *Id*. Thus, defendant had to show bad faith with respect to the failure to preserve. *Hanks*, 276 Mich at 95.

With respect to bad faith, there is no indication on the record that the victim washed his arm off in bad faith. While defendant argues that the victim knowingly and intentionally destroyed the evidence and that not preserving evidence of misconduct violated the prison operating procedures, testimony was presented regarding what steps should be taken, in accordance with the operating procedures, to collect evidence in a case such as this one:

> We photograph it to maintain the evidence to show, in this case, in a courtroom what has happened and then we encourage the employee to clean quickly afterwards. Prisons have people with communicable diseases and there's a concern of getting it washed off as quickly as possible.

Further testimony revealed that the prison was not equipped to scrape saliva off one's arm and put it in a test tube for DNA purposes. The victim testified that he saw defendant spit on him, that he informed his supervisor, that he made a report of the misconduct, that he waited for his arm to be photographed, and that he washed his arm off with soap and water after the pictures were taken. The record simply does not support that the victim washed the saliva off his arm in bad faith. See *United States v Garza*, 435 F3d 73, 75 (CA 1, 2006) (explaining that conscious and deliberate actions were not enough to show bad faith and that "even if, as found by the district court, [the police's] actions were 'short-sighted and even negligent,' this does not satisfy the requirement of bad faith"). See also *Johnson*, 197 Mich App at 365 (explaining that "the routine destruction of taped police broadcasts, where the purpose is not to destroy evidence for a forthcoming trial, does not mandate reversal").

In sum, because defendant has not met his burden of establishing that "the evidence was exculpatory or that the police acted in bad faith," *id.*, defendant's due process claim based on the destruction of evidence is without merit, *Hanks*, 276 Mich App at 95; *Johnson*, 197 Mich App at 365. Accordingly, defendant is not entitled to relief.

## IV.  RESENTENCING

Next, defendant argues that he is entitled to resentencing because his sentence was based on inaccurate guidelines and was unreasonable under *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015).  "A sentence that departs from the applicable guidelines range [is] reviewed by an appellate court for reasonableness."  *Id.* at 392.  Recently, in *People v Steanhouse*, ___ Mich App ___; ___ NW2d ___ (2015) (Docket No. 318329, issued October 22, 2015); slip op at 21-24, this Court held that the reasonableness of a sentence is determined by using the "principle of proportionality" standard set forth in *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990).

Here, defendant raised a scoring challenge to Offense Variable (OV) 19 in a motion for resentencing.  At the hearing on the motion, the prosecution agreed with the scoring change, which changed defendant's applicable guidelines range to 12 to 48 months—making his minimum sentence of 50 months outside the applicable guidelines range.  The trial court stated that it considered the new sentencing guidelines range but, nonetheless, determined that the sentence was reasonable.  However, the trial court's ruling on the issue occurred before the *Steanhouse* decision was issued.  Therefore, "the trial court was unaware of and not expressly bound *by [the] reasonableness standard rooted in the Milbourn principle of proportionality* at the time of sentencing."  *Steanhouse*, ___ Mich App at ___; slip op at 25 (emphasis added).  See also *People v Shank*, ___ Mich App ___; ___ NW2d ___ (2015) (Docket No. 321534, issued November 17, 2015); slip op at 3 (explaining that "the trial court did not have the benefit of our Supreme Court's decision in *Lockridge* or *this Court's decision in Steanhouse*") (emphasis added).

## V.  STANDARD 4 BRIEF

Next, defendant, in propria persona, argues that the retroactive application of *Lockridge* violates the Ex Post Facto Clause.  However, defendant waived this issue.  "[W]aiver is the intentional relinquishment or abandonment of a known right."  *People v Vaughn*, 491 Mich 642, 663; 821 NW2d 288 (2012) (quotation marks and citation omitted).  "A defendant who waives a right extinguishes the underlying error and may not seek appellate review of a claimed violation of that right."  *Id.*  Specifically, "[a] defendant should not be allowed to assign error on appeal to something his own counsel deemed proper" before the trial court.  *People v Green*, 228 Mich App 684, 691; 580 NW2d 444 (1998).  "To do so would allow a defendant to harbor error as an appellate parachute."  *Id.*  At the hearing on the motion for resentencing, defense counsel argued that the *Lockridge* decision was issued after her written motion and that *Lockridge* "made it so the guidelines are advisory but ordered that the Trial Courts consider the applicable guideline range in fashioning a sentence and then that sentence would be reviewed for reasonableness."  Defense counsel further argued that, under *Lockridge*, defendant's sentence was unreasonable.  Accordingly, by making this argument, defense counsel deemed the application of *Lockridge* to defendant's case proper at the trial court level.  To allow defendant to assign error on appeal to the application of *Lockridge* would allow defendant harbor this alleged error as an appellate parachute.  *Id.*  Thus, this issue is waived, and the alleged error is extinguished.  *Vaughn*, 491 Mich at 663.

Moreover, even if defendant had not waived the issue, he has not demonstrated plain error for this unpreserved argument.  *People v Carines*, 460 Mich 750, 762-765; 597 NW2d 130

(1999). "The Ex Post Facto Clause, by its own terms, does not apply to courts." *Rogers v Tennessee*, 532 US 451, 460; 121 S Ct 1693, 1699; 149 L Ed 2d 697 (2001). The Clause "is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government." *Id.* at 456; 121 S Ct 1693, 1697. Defendant relies on cases that have found Ex Post Facto Clause violations when different versions of sentencing guidelines were applied. See eg, *Peugh v United States*, ___ US ___, ___; 133 S Ct 2072, 2082; 186 L Ed 2d 84 (2013) (explaining "that applying amended sentencing guidelines that increase a defendant's recommended sentence can violate the Ex Post Facto Clause"). However, these cases are distinguishable because an amended version of the sentencing guidelines was not applied to defendant's case. Defendant's case was pending on direct review when *Lockridge* was issued on July 29, 2015. Therefore, because defendant's case was pending on review, *Lockridge* applies retroactively. See *People v Lonsby*, 268 Mich App 375, 389; 707 NW2d 610 (2005) ("[I]t is well-established that a new rule for the conduct of criminal prosecutions that is grounded in the United States Constitution applies retroactively to all cases, state or federal, pending on direct review or not yet final.") See also *United States v Barton*, 455 F3d 649, 657 (CA 6, 2006) (explaining that the Court was "join[ing] *every other* circuit in holding that [retroactively applying] *Booker*[2] does not violate ex post facto-type due process rights of defendants") (emphasis added). Defendant failed to establish plain error, *Carines*, 460 Mich at 763, and as a consequence thereof, is not entitled to relief.

Lastly, defendant argues that his due process rights were violated because the prosecution failed to timely file its notice seeking to enhance defendant's sentence. The resolution of this issue involves the interpretation of a statute, which this Court reviews de novo. *People v Morales*, 240 Mich App 571, 575; 618 NW2d 10 (2000). MCL 769.13 governs the timing of when a prosecutor may seek to enhance a defendant's sentence under the habitual offender statutes and provides in pertinent part:

> (1) In a criminal action, the prosecuting attorney may seek to enhance the sentence of the defendant as provided under section 10, 11, or 12 of this chapter, by filing a written notice of his or her intent to do so within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived, within 21 days after the filing of the information charging the underlying offense.

Here, defendant did not waive his arraignment. Therefore, the applicable time period for measuring the 21-day period begins with the date of "defendant's *arraignment on the information* charging the underlying offense." MCL 769.13(1) (emphasis added). Contrary to defendant's argument on appeal, there is a distinction between an arraignment on the information and an arraignment on the warrant or complaint. Compare MCR 6.104 ("Arraignment on the Warrant or Complaint"), with MCR 6.113 ("The Arraignment on the Indictment or Information"). See also *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013) (referring to the arraignment on the information as the "circuit court arraignment"). Defendant was

---

[2] *United States v Booker*, 543 US 220; 125 S Ct 738; 160 L Ed 2d 621 (2005).

arraigned on the information in circuit court on February 13, 2014. On that same day, the prosecution filed the first amended information, which contained a fourth offense habitual offender notice. Thus, the prosecution's notice came well within the 21-day period after defendant's arraignment on the information. MCL 769.13(1). Accordingly, defendant's due process argument premised upon the timing of the prosecution's notice fails.

Affirmed but remanded for further inquiry as to whether resentencing is required. We do not retain jurisdiction.


/s/ Henry William Saad
/s/ Stephen L. Borrello
/s/ Michael F. Gadola