*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TERRY DEVONTAY DUMAS,

        Defendant-Appellant.

UNPUBLISHED
August 14, 2025
9:30 AM

No. 369460
Wayne Circuit Court
LC No. 11-008346-02-FC

Before: YOUNG, P.J., and LETICA and KOROBKIN, JJ.

PER CURIAM.

Defendant appeals by right following his jury-trial convictions on one count of first-degree felony murder, MCL 750.316; two counts of armed robbery, MCL 750.529; one count of assault with intent to murder, MCL 750.83; two counts of torture, MCL 750.85; two counts of unlawful imprisonment, MCL 750.349b; and one count of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to life imprisonment for felony murder; 30 to 45 years' imprisonment for each conviction of armed robbery, assault with intent to commit murder, and torture; and 10 to 15 years' imprisonment for the unlawful imprisonment convictions, to be served concurrently. Defendant was also sentenced to a consecutive two-year term of imprisonment for the felony-firearm conviction.

On appeal, defendant challenges the sufficiency of the evidence to support his convictions and the trial court's upward departure from the sentencing guidelines on some of his sentences. We affirm defendant's convictions but remand for resentencing.

## I. BACKGROUND AND FACTS

Defendant's convictions arise from his participation, with at least five others, in events that led to the shooting death of William Abrams and the nonfatal shooting of Jeffrey Herron.

Herron, defendant, Toneya Horton (Toneya), Tony Horton (Tony), Christopher Lewis, and Taywon Williams grew up in the same neighborhood near 250 Chalmers in Detroit. One day in August 2011, Herron and Abrams, a friend of Herron's from Virginia, approached Tony about purchasing approximately $4,300 worth of Oxycontin pills. Tony told them he had to arrange the

delivery of the pills. The next day, Tony called Herron to inform Herron that he had the pills and told Herron to bring Abrams and the money to Tony's house at 250 Chalmers. When Herron and Abrams entered Tony's home, they approached Tony, and asked about the pills. Defendant, Tony, Toneya, Williams, and Lewis appeared from hiding and brandished an array of firearms at Herron and Abrams.

One of the assailants instructed Herron and Abrams to empty their pockets; place their belongings, including their cell phones, on the table; and lie on the ground face down. Herron heard Tony instruct his associates to retrieve rope and duct tape. Lewis told Herron not to move while Lewis hogtied Herron and duct taped his mouth. Herron could not see who tied and duct taped Abrams, but defendant later told police that he helped tie up the victims. Herron and Abrams lay on the floor of the residence for approximately six to eight hours. Herron chewed through the duct tape over his mouth to beg for his life. One of the assailants started up a chainsaw while Abrams and Herron remained immobile on the floor. The assailants also smoked marijuana that they bought with the victims' money while they spoke about their plans for Herron and Abrams. One of the assailants made a remark that led Herron to believe that he was not going to survive the assault.

After the assailants donned latex gloves and attempted to clean their fingerprints from the duct tape and the victims' bodies, they carried Herron and Abrams to Herron's vehicle. Herron was placed on the floor of the rear seat facedown and Abrams was placed on the rear seat facedown. Both victims' heads were placed on the driver's side. After Tony drove the vehicle for a while, he stopped, exited the vehicle, and shot Herron and Abrams in their heads and chests. The assailants left the scene, and a witness who heard the gunshots called 911. Upon the police's arrival, Abrams had died from his injuries, but Herron was still alive and transported to the hospital. Law enforcement executed a search warrant at 250 Chalmers later that day, where they found and arrested defendant.

Defendant was convicted and sentenced in July 2012. Because of a series of mishaps, the details of which need not be recounted here, defendant did not file a timely appeal. In 2023, however, the trial court granted defendant's motion to restore his appellate rights, and his case now proceeds as a claim of appeal by right.

## II. STANDARDS OF REVIEW

We review challenges to the sufficiency of the evidence de novo. *People v Solloway*, 316 Mich App 174, 180; 891 NW2d 255 (2016). To determine whether the prosecution produced evidence sufficient to support a conviction, this Court reviews the evidence "in the light most favorable to the prosecutor" to determine "whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010) (quotation marks and citation omitted). This Court must also "draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (quotation marks and citation omitted). We "will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

"A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). When reviewing a sentence for reasonableness, the standard of review is "whether the trial court abused its discretion by violating the principle of proportionality." *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017). "A trial court abuses its discretion if the imposed sentence is not proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Ventour*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 363922); slip op at 7 (quotation marks and citation omitted). Additionally, we review questions of constitutionality in sentencing de novo. *People v Stovall*, 510 Mich 301, 312; 987 NW2d 85 (2022).

## III. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

Defendant argues that that there was insufficient evidence to support his convictions.[1] We disagree.

> The elements of first-degree felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [MCL 750.316(1)(b) . . . ]. [*People v Smith*, 478 Mich 292, 318-319; 733 NW2d 351 (2007) (quotation marks and citation omitted; alterations in original).]

"The facts and circumstances of the killing may give rise to an inference of malice." *People v Carines*, 460 Mich 750, 759; 597 NW2d 130 (1999). "A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *Id*. Additionally, a jury may infer malice from the use of a deadly weapon. *Id*.

MCL 767.39 provides that "[e]very person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense." A conviction based on an aiding and abetting theory must be supported by the following three elements:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that

---

[1] Defendant seems to contend that there was insufficient evidence to support all of his convictions; however, he did not set forth any argument regarding his false imprisonment convictions. Therefore, we treat this issue as abandoned. See *People v Jarrell*, 344 Mich App 464, 487-488; 1 NW3d 359 (2022) (a party abandons an issue on appeal by failing to adequately brief its merits).

[the defendant] gave aid and encouragement. [*People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006) (quotation marks and citation omitted; alteration in original).]

The prosecution may also prove the charged offense on an aiding and abetting theory if "the charged offense was a natural and probable consequence of the commission of the intended offense." *Id*. at 15. "An aider or abettor's state of mind may be inferred from all the facts and circumstances . . . ." *Ventour*, ___ Mich App at ___; slip op at 6.

Robbery and torture are felonies enumerated in MCL 750.316(1)(b).[2]  The elements of armed robbery under MCL 750.529 are:

> (1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Muhammad*, 326 Mich App 40, 61; 931 NW2d 20 (2018) (quotation marks and citation omitted.]

MCL 750.85 defines torture, in relevant part, as:

> (1) A person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control commits torture and is guilty of a felony punishable by imprisonment for life or any term of years.
>
> (2) As used in this section:
>
> (a) "Cruel" means brutal, inhuman, sadistic, or that which torments.
>
> (b) "Custody or physical control" means the forcible restriction of a person's movements or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority.
>
> (c) "Great bodily injury" means either of the following:
>
> \* \* \*

---

[2] The jury was instructed that it could convict defendant of first-degree felony murder based on the underlying enumerated felonies of larceny, armed robbery, or torture. Because we conclude that there was sufficient evidence of armed robbery and torture, we need not consider whether there was sufficient evidence of larceny.

(*ii*) One or more of the following conditions: internal injury . . . .

(d) "Severe mental pain or suffering" means a mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner caused by or resulting from any of the following:

(*i*) The intentional infliction or threatened infliction of great bodily injury.

\* \* \*

(*iii*) The threat of imminent death.

(*iv*) The threat that another person will imminently be subjected to death, great bodily injury, or the administration or application of mind-altering substances or other procedures calculated to disrupt the senses or personality.

"The elements of assault with intent to commit murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v Ericksen*, 288 Mich App 192, 195-196; 793 NW2d 120 (2010) (quotation marks and citation omitted). See MCL 750.83.

Defendant argues that there was no direct evidence that he participated in the robbery, threatened the victims with the chainsaw, or took the victims out of the house to shoot them. However, Herron testified that when he and Abrams entered 250 Chalmers, defendant and at least four other men appeared, and each man pointed a weapon at Herron and Abrams. One of the men instructed Abrams and Herron to empty their pockets and put everything, including their cell phones, on the table. Abrams and Herron were further ordered to lie on the floor and put their hands behind their backs. Herron testified that he and Abrams were held at gunpoint by some of the assailants while the remainder of the assailants tied their arms and legs behind their backs and duct taped their mouths shut. Defendant admitted to police that he helped tie up the victims.

Herron testified that he and Abrams lay on the floor for hours tied and taped, while defendant and the other assailants threatened them and taunted them with the sounds of a chainsaw. Herron testified that Tony told Herron and Abrams to say hello to a neighbor who had recently been killed, implying that they too would be killed. Herron also testified that he chewed through the duct tape and begged for the assailants to let him go.

Lewis testified that Tony called him and told him to come to 250 Chalmers with rope and a shotgun to make some "easy money." In his statement to police, defendant stated that he was at Lewis's house before he went to 250 Chalmers and heard the phone call between Lewis and Tony. Defendant walked to 250 Chalmers with Lewis knowing that a robbery was going to take place. Defendant admitted to participating in the tying up of Abrams and Herron, and testimony was introduced at trial that defendant was armed. Defendant also admitted that he received a share of the money that had been taken from Herron and Abrams. Defendant claimed that he left 250 Chalmers after the victims were tied. However, Herron testified that defendant left and returned. In addition to Herron's testimony that defendant returned, defendant admitted that he knew that Herron and Abrams were still hogtied when Tony drove away with them in the vehicle.

Viewed in a light most favorable to the prosecution, this evidence was sufficient to support defendant's convictions. The evidence demonstrated that defendant actively assisted and participated in the armed robbery and torture by holding Herron and Abrams at gunpoint, hogtying Herron and Abrams, taunting Herron and Abrams while they were immobilized on the floor, and sharing in the money taken from Herron and Abrams. Additionally, defendant was aware that Herron and Abrams could identify him and the other assailants, and that the assailants donned gloves to clean fingerprints from Herron, Abrams, the duct tape, and the rope before placing them in a vehicle to be driven to another location. And while defendant may not have been present for the fatal and nonfatal shots themselves, the evidence was sufficient to establish both that Tony intended to kill Herron and Abrams by shooting them in their heads and chests after their robbery and torture, and that defendant knowingly participated in acts that helped bring those events about. The evidence is sufficient, in other words, to support a jury finding that defendant aided and abetted both an assault with intent to murder Herron and the first-degree felony murder of Abrams by establishing that defendant "had knowledge that the principal intended its commission at the time that [he] gave aid and encouragement" and that "the charged offense was a natural and probable consequence of the commission of the intended offense." *Robinson*, 475 Mich at 6, 15.

## B. DEPARTURE FROM SENTENCING GUIDELINES

Defendant also argues that the trial court erred by failing to state its rationale for its upward sentence departure for the armed robbery, assault with intent to murder, and torture convictions. We agree.

At the time defendant was sentenced, the sentencing guidelines were mandatory and a sentencing court was required to articulate a "substantial and compelling reason" to depart from the applicable guidelines range. *Lockridge*, 498 Mich at 364-365. Our Supreme Court's subsequent decision in *Lockridge* significantly changed the legal landscape around sentencing in this state by rendering the guidelines advisory, eliminating the "substantial and compelling reason" requirement for departures from the guidelines, and reinstating the "principle of proportionality" as the rule of decision for sentencing in the post-*Lockridge* world. See *id*.; *Steanhouse*, 500 Mich at 471-472. Because this case comes to us on direct appeal, we must apply the current law to defendant's challenge to his above-guidelines sentence. *People v Richards*, 315 Mich App 564, 587; 891 NW2d 911 (2016), rev'd in part on other grounds 501 Mich 921 (2017).

The sentencing guidelines, while advisory instead of mandatory, are still a "highly relevant consideration in a trial court's exercise of sentencing discretion." *Lockridge*, 498 Mich at 391. "Because the guidelines embody the principle of proportionality and trial courts must consult them when sentencing, it follows that they continue to serve as a 'useful tool' or 'guideposts' for effectively combating disparity in sentencing." *People v Dixon-Bey*, 321 Mich App 490, 524-525; 909 NW2d 458 (2017). The key test of the principle of proportionality, however, is "whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range." *Steanhouse*, 500 Mich at 472 (quotation marks and citation omitted). Factors to consider when determining proportionality include:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct

while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*People v Sherrill*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 360133); slip op at 9 (quotation marks and citation omitted).]

At sentencing, a trial court must "justify the sentence imposed in order to facilitate appellate review." *Dixon-Bey*, 321 Mich at 525 (quotation marks and citations omitted). It must explain "why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been." *Id*. (quotation marks and citation omitted). And it must give an "explanation for the *extent* of [a] departure independent of the reasons given to impose a departure sentence." *People v Smith*, 482 Mich 292, 305-306; 754 NW2d 284 (2008). "Even where some departure appears to be appropriate, the extent of the departure (rather than the fact of the departure itself) may embody a violation of the principle of proportionality." *People v Milbourn*, 435 Mich 630, 660; 461 NW2d 1 (1990).

As previously stated, the trial court sentenced defendant to 30 to 45 years' imprisonment for each conviction of armed robbery, assault with intent to commit murder, and torture. The range for the minimum sentence under the sentencing guidelines for each of these convictions was 135 months to 225 months (11 years and 3 months to 18 years and 9 months). In other words, the trial court departed upward from the top of the guidelines range by 135 months, or 11 years and 3 months.

The trial court's articulated reason for departure from the sentencing guidelines was that defendant's "offense characteristics [were] given an inadequate weight" because his offense variable score "substantially exceed[ed]" the 100-point maximum score anticipated by the Legislature for the sentencing grid, stating that the remaining 195 points "[did] not impact the Defendant's guidelines or sentence." Although the trial court identified a factor accounted for by the guidelines but given inadequate weight, it failed to explain why its imposed sentence was more proportionate to defendant and his conduct than a different sentence would have been, and it failed to explain the extent of its departure independent of its reasons to depart. See *Smith*, 482 Mich at 310-311; *People v Lydic*, 335 Mich App 486, 500-501; 967 NW2d 847 (2021). Because the trial court failed to provide adequate reasons for the sentences imposed, we vacate the sentences for armed robbery, assault with intent to murder, and torture and remand for resentencing. See *Steanhouse*, 500 Mich at 476. We do not foreclose the possibility that such sentences would comply with the principle of proportionality, but defendant must be resentenced under the correct legal standard and with an opportunity for the trial court to explain the sentence imposed.

## C. RESENTENCING FOLLOWING *TAYLOR*

We additionally note that, while this appeal was pending, our Supreme Court decided *People v Taylor*, ___ Mich ___; ___ NW3d ___ (2025) (Docket Nos. 166428, 166654), holding that MCL 750.316's mandatory life sentence for first-degree murder violates the Michigan Constitution's prohibition on cruel or unusual punishment, Const 1963, art 1, § 16, when applied to anyone under the age of 21 at the time of their offense. As the record reflects that defendant was 19 years old at the time of the offense in question, he is automatically entitled to resentencing on his first-degree murder conviction consistent with *Taylor*. Additionally, under *People v Turner*, 505 Mich 954, 954 (2020), "the trial court may exercise its discretion to resentence . . . defendant

on a concurrent sentence if it finds that the sentence was based on a legal misconception that . . . defendant was required to serve a mandatory sentence of life without parole on the greater offense."

## IV. CONCLUSION

We affirm defendant's convictions, we vacate defendant's sentences, and we remand for resentencing. We do not retain jurisdiction.

/s/ Adrienne N. Young
/s/ Anica Letica
/s/ Daniel S. Korobkin